1
2
3
4
5
6                          **UNITED STATES DISTRICT COURT**
7                          **EASTERN DISTRICT OF CALIFORNIA**
8
9   **SUN VALLEY FARMS, LLC,**                    **CASE NO. 1:20-CV-1665 AWI JLT**
10                      **Plaintiff-Appellant,**
                                                   **ORDER ON DEFENDANT'S MOTION**
11              **v.**                             **FOR SUMMARY JUDGMENT**
12  **WESTERN VEG PRODUCE, INC.,**
                                                   (Doc. No. 28)
13                      **Defendant-Appellee**
14
15
16          This is an appeal under 7 U.S.C. § 499g(c) of the Perishable Agricultural Commodities Act
17  ("PACA") by Plaintiff-Appellant Sun Valley Farms, LLC ("Sun Valley") from a decision by the
18  Secretary (the "Secretary") of the United States Department of Agriculture ("USDA").  Currently
19  before the Court is Defendant-Appellee Western Veg Produce, Inc.'s ("Western Veg") motion for
20  summary judgment.  For the reasons that follow, Western Veg's motion will be denied.
21
22                          **SUMMARY JUDGMENT STANDARD**
23          Summary judgment is proper when it is demonstrated that there exists no genuine issue as
24  to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.
25  Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-
26  Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears
27  the initial burden of informing the court of the basis for its motion and of identifying the portions
28  of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

899.  Summary judgment may not be granted "where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2015).  Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Fitzgerald v. El Dorado Cnty., 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties have the obligation to particularly identify material facts, and the court is not required to scour the record in search of a genuine disputed material fact.  Californians for Renewable Energy v. Cal. PUC, 922 F.3d 929, 935-36 (9th Cir. 2019); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

In the specific context of a PACA appeal, on summary judgment, the factual findings of the Secretary are prima facie valid and will be accepted by the court as established, unless the findings are rebutted by the opposing party.  See Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1033 (D.C. Cir. 1988); Spano v. Western Fruit Growers, 83 F.2d 150, 152 (10th Cir. 1936); Sierra Kiwi, Inc. v. Rui Wen, Inc., 2013 U.S. Dist. LEXIS 160404, *8 (E.D. Cal. Nov. 6, 2013); Genecco Produce, Inc. v. Sandia Depot, Inc., 386 F.Supp.2d 165, 171-72 (W.D. N.Y. 2005).  A party may rely on evidence that was presented and considered by the Secretary, as well as evidence that was not presented and considered by Secretary, in order to attempt to rebut the Secretary's findings and determinations.  See Sun Pac. Mktg. Coop. v. Dimare Fresh, Inc., 2010 U.S. Dist. LEXIS 83176, *25-*26 (E.D. Cal. Aug. 13, 2010).  A failure to submit any evidence will not rebut the Secretary's findings and determinations.  See Frito-Lay, 863 F.2d at 1034, 1036.

**FACTUAL BACKGROUND**[1]

Around the summer of 2016, Western Veg and Sun Valley began discussions regarding the sale of Sun Valley's avocados.  See Ollivier Dec. ¶ 9;[2] Lym Dec. ¶ 4.[3]  In August 2016, Western Veg's President David Ollivier ("Ollivier") and salesmen Michael Huston ("Huston") and Dylan Lym ("Lym") met with Sun Valley's Controller Erwin Bartel and Manager Jared Sanders, as well as the proposed avocado growers.[4]  See id.  Jared Sanders and Ollivier had known each other for 20 years.  DUMF 11.  Western Veg had marketed grapes from 2009 to 2012 for a company owned by Jared Sanders called "Jerad R. Sanders Farming., Inc."  See  DUMF 13, PRDUMF 13.  Some of the deals with Western Veg for Jared Sanders's grapes were consignment deals, while others were FOB.  See DUMF 13; PRDUMF 13; J. Sanders Depo. 48:13-49:10.  However, despite discussions and Ollivier's familiarity with Jared Sanders and Bartel, no avocados appear to have been transferred between Western Veg and Sun Valley in 2016.

On January 6, 2017, Ollivier sent Bartel by e-mail a written consignment agreement to review for the marketing of avocados.  See PACA Decision at 19; Ollivier Dec. ¶ 11; DUMF 21.[5]

---

[1] "DUMF" refers to "Western Veg's Undisputed Material Fact," and "PUMF" refers to "Sun Valley's Undisputed Fact," and "PRUMF" refers to "Sun Valley's Response to Western Veg's Undisputed Fact."

[2] David Ollivier's declaration was submitted and considered by the Secretary in the parties' PACA proceedings and is Doc. No. 29-8.  Ollivier's declaration is Exhibit 8 to Western Veg's Request for Judicial Notice.  The Court will consider Ollivier's declaration, but it will not grant judicial notice of the declaration because there is no utility in doing so.  No party disputes that Ollivier submitted the declaration in the PACA proceedings, and taking judicial notice of the declaration will not conclusively establish its contents.  Cf. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 386 n.1 (9th Cir. 2010) (holding that the content of a deposition is not a clearly established fact for purposes of judicial notice).

[3] Dylan Lym's declaration was submitted and considered by the Secretary in the parties' PACA proceedings and is Doc. No. 29-9.  Lym's declaration is Exhibit 9 to Western Veg's Request for Judicial Notice.  For the same reasons discussed with respect to the Ollivier declaration, the Court will consider Lym's declaration, but will not take judicial notice of it.  Cf. In re Oracle, 627 F.3d at 386 n.1.

[4] The growers at the meeting were not the growers who ultimately supplied the avocados to Sun Valley and Western Veg.  See Ollivier Dec. ¶ 9; Lym Dec. ¶ 4.

[5] Sun Valley objects that DUMF 21 is hearsay and violates Rule of Evidence 1002, the best evidence rule.  See PRDUMF 21.  As to the hearsay objection, DUMF 21 states that Ollivier sent Bartel a consignment agreement via e-mail, and no more.  DUMF 21 is describing an action, not a statement; therefore, DUMF 21 contains no hearsay.  See Fed. R. Evid. 801(c).  As to the best evidence rule objection, the contents of the e-mail are not described, other than the consignment agreement was an attachment.  See DUMF 21.  The consignment agreement at issue is part of the parties' PACA proceeding record, see Doc. No. 6 at 84-106, and, importantly, the PACA Decision found Ollivier sent the e-mail to Bartel and stated that the e-mail was an exhibit submitted by Western Veg.  See PACA Decision at 19. From the parties' PACA proceeding, it is apparent that the parties are in possession of the e-mail and the Secretary relied on it.  Therefore, the Rule 1002 objection is insufficient to undermine the Secretary's findings or DUMF 21.

1   On January 9, 2017, Bartel replied that he was out of town and would print the agreement and get

2   back to Ollivier the next day.  See PACA Decision at 19; Ollivier Dec. ¶ 11; DUMF 22.[6]

3   However, there is no evidence that Bartel printed the consignment agreement, forwarded the

4   consignment agreement to anyone at Sun Valley, had authority to accept the terms of the

5   consignment agreement on behalf of Sun Valley, contacted Ollivier on January 10, 2017, or

6   otherwise spoke to Ollivier regarding the consignment agreement.  Andrew Sanders, a managing

7   member of Sun Valley, has declared that he never saw the consignment agreement until sometime

8   after March 2018.  See A. Sanders Opposition Dec. ¶ 8.

9          The consignment agreement sent to Bartel by Ollivier ("the CA") provided for a 10%

10  commission on sales prices, plus cooling costs, and a harvest advance of 50% of the sales price

11  less deductions.  See Doc. No. 6 at ECF pp. 89-90, 99; PACA Decision at 19; DUMF 26.  The CA

12  provided that Western Veg had authority to act in its sole discretion to resolve quality problems or

13  consummate sales, and gave Western Veg authority to sell the avocados "F.O.B., Delivered,

14  Consignment, Re-consignment, Open, Price-After-Sale, Price After Arrival, Joint Account or

15  Delayed Billing basis."[7]  Doc. No. 6 at ECF p. 88; DUMF 25.  The CA also stated in part:  "If

16  [Sun Valley's] Fruit is delivered to [Western Veg] after receipt of this [CA], [Sun Valley] will be

17  deemed to have acquiesced to the terms of this [CA], regardless of whether either or both parties

18  executed and returned the [CA]."  See PACA Decision at 19; Doc. No. 6 at ECF p. 96; DUMF 23.

19  The CA covered the 2016-2017 growing season.  See PACA Decision at 22.  No one from Sun

20  Valley ever signed the CA.  See DUMF 28.  However, throughout 2017, Ollivier would

21  sometimes receive calls from Bartel or Jared Sanders to keep in touch and to let Ollivier know that

22  they were still interested in importing avocados from Mexico.  See DUMF 27.

23         In December 2017, Ollivier received a telephone call from Bartel in which Bartel informed

24

25  [6] Sun Valley objects that DUMF 22 violates Rule of Evidence 1002 because no e-mail is found in the record.  See
    PRDUMF 22.  Sun Valley is correct that Western Veg has not submitted the January 2017 e-mail and the contents of
26  the e-mail are described by DUMF 22.  Nevertheless, the PACA Decision found that Bartel sent a reply to Ollivier as
    described by DUMF 22 and noted that Western Veg had submitted the e-mail exchange as part of the PACA
27  proceeding.  See PACA Decision at 19.  It is apparent that the parties are in possession of the e-mail and the Secretary
    relied on it.  Thus, the Rule 1002 objection does not undermine the Secretary's findings or DUMF 22.

28  [7] Ollivier described this provision as giving Western Veg total marketing authority.  See Ollivier Dec. at ¶ 13.

1  him that Sun Valley had a load of avocados at the Mexico-Texas border.  See DUMF 29;

2  PRDUMF 29.  On December 20, 2017, December 22, 2017, January 3, 2018, January 10, 2018,

3  and January 15, 2018, Sun Valley shipped a total of six loads of avocados (loads four and five

4  were both sent on January 10) to Western Veg; each of the six loads of avocados graded at U.S.

5  No. 2 grade.[8]  See DUMF's 36, 38, 40, 42, 44, and 46.  The USDA Inspection forms for five of the

6  six loads (all loads except for Load #2) indicate that the avocados are "Don Avocados."  See Doc.

7  No. 6 at ECF pp. 54, 55, 56, 61, 64, 66, 68, 70.  Ollivier has declared that during this time, the

8  market was flooded with avocados and finding buyers for U.S. No. 2 grade avocados was

9  extremely challenging, as buyers were even passing on U.S. No. 1 grade avocados.  See Doc. No.

10  28-8 at ¶ 17.  Further, potential buyers would not purchase the Sun Valley avocados when the

11  buyers learned that the avocados were "Don Avocados."  See id.  Purchasers knew that growers of

12  "Don Avocados" were infamous for not pre-cooling their avocados, which leads to condition and

13  quality defects.  See id.

14      Despite all loads grading at U.S. No. 2 and most of the loads being "Don Avocados,"

15  Western Veg sold all six loads.  Western Veg resold Load #1 on December 20, 2017 for $65,360;

16  resold Load #2 between December 28, 2017 and January 19, 2018 for $58,678.50; resold Load #3

17  between January 9, 2018 and January 19, 2018 for $13,720.52; resold Loads #4 and #5 between

18  January 19, 2018 and January 22, 2018 for $20,875.50 and $31,314 respectively; and resold Load

19  #6 on January 19, 2018 for $38,519.50.  See DUMF's 37, 39, 41, 43, 45, and 47; PACA Decision

20  at ¶¶ 3-20.  Upon completion of each of the resales, Western Veg prepared six separate liquidation

21  reports.  See id.

22      For its part, Sun Valley prepared invoices to Western Veg for each of the avocado loads.

23  See Doc. No. 30-5.  The invoice for Load #1 is dated December 20, 2017, states that $88,762 is

24  due, and has the words "FOB Texas" under a box marked "P.O. No."  See id.  The invoice for

25  Load #2 is dated December 27, 2017, states that $90,946 is due, and has the words "FOB Texas"

26  under the "P.O. No." box.  See id.  The invoice for Load #3 is dated January 3, 2018, states that

---

27

28  [8] The USDA Inspection forms for the first load of December 20, 2017, indicate that the avocados were graded at U.S. No. 1 grade.  See Doc. No. 6 at ECF pp. 55, 56.  However, because Sun Valley admits that the first load graded at US. No. 2 grade, see PRDUMF No. 36, the Court accepts that all loads of avocados were U.S. No. 2 grade.

$72,282 is owed, has the words "FOB Texas" under the "P.O. No." box.  See id.  The invoice for

Load #4 is dated January 11, 2018, states that $61,440 is due, and has the words "FOB Texas"

under the "P.O. No." box.  See id.  The invoice for Load #5 is dated January 11, 2018, states that

$68,367 is due, and has the words "FOB Texas" under the "P.O. No." box.  See id.  Finally, the

invoice for Load #6 is dated January 11, 2018, states that $65,333 is due, and has the words "FOB

Texas" under the "P.O. No." box.  See id.  Load #6, however, was not actually shipped or graded

until January 15, 2018.  See DUMF 46.

Shortly after the first load was delivered to Western Veg, Bartel sent Ollivier and Lym a

number of e-mails.  On December 21, 2017, Bartel and Ollivier exchanged four e-mails.  Bartel

sent Ollivier an e-mail that read:  "When this morning will you be transferring funds to [Sun

Valley] for the first load.  50% less your commission.  The second load should be arriving today."

PACA Decision at 12; DUMF 48.  Bartel then sent Ollivier a second e-mail that purported to be an

invoice for the first load, with the amount of the invoice listed as $88,960.  PACA Decision at 14-

15; DUMF 49.  Ollivier sent Bartel a reply e-mail that read:  "Erwin – I will be forwarding what

we sold this load for – its not close to what this invoice reflects – I will be sending lot report

shortly.  Wire is on its way."  PACA Decision at 15; DUMF 50.  At 2:35 p.m., Bartel sent Ollivier

an e-mail that read:  "When you send the lot report, will it show where the avocados were sold?

We need to know that.  Based on the wire amount, we are concerned as to the market.  We

expected much more from this load."  PACA Decision at 15; DUMF 51.  Sometime after Bartel's

last e-mail, Western Veg provided a detailed account of sale that day.  DUMF 52.[9]

On December 26, 2017, Bartel sent an e-mail to Ollivier that read:  "Any lot report on

[Load #2] that arrived on 12/22/2017?"  PACA Decision at 12.

On December 27, 2017, Bartel sent an e-mail to Lym that read:  "Any Lot Report from

yesterday's shipment?  Transfer of funds today?"  PACA Decision at 12.  Bartel sent a second e-

---

[9] Sun Valley objects that DUMF violates Rule of Evidence 1002 and no document was submitted with the motion that
is consistent with DUMF 52.  However, DUMF 52 is supported by the Ollivier Declaration, which is part of the
PACA proceeding record and Western Veg's Request for Judicial Notice.  Further, the best evidence rule does not
apply because DUMF 52 does not purport to describe the contents of the account of sale, it is merely averring that an
account of sale was provided.  Therefore, Sun Valley's objections are overruled, and DUMF 52 is established.

mail that day to Ollivier, Lym and Huston that read:  "Will we receive a lot report and fund transfer today for the load shipped yesterday?"  DUMF 53.

On December 28, 2017, Bartel sent an e-mail to Lym that read:  "Do we have a Lot Report on the 2nd load?  1,920 boxes."  DUMF 54.

On January 8, 2018, Bartel sent an e-mail to Ollivier and Lym that read:  "What is the status of payment on the 1st load?  What is the status of advance payment on Load #3 and Load #4?  Do you have a lot report on Load #3?"  DUMF 55.  Ollivier responded to Bartel in an e-mail that read:  "First Load – We shipped on the 20th – So final payment will be around the 20th of January – Third Load just shipped – I will pay today half – Don't know when the forth is coming?"  DUMF 57.  Bartel responded to Ollivier in an e-mail that read:   "The 4th load is being shipped this morning.  I thought it went last week."  DUMF 58.

On January 10, 2018, Bartel sent an e-mail to Ollivier, Lym, and Huston that read:

> Following up with our conversation yesterday with you, Jerad [Sanders] and I.  We emphasized the need for communication.  We need the projected sales prices each week on avocados.  Upon receipt of a load in Texas that meets USDA Inspection, [Western Veg] will advance [Sun Valley] 50% of the projected sales price.  [Sun Valley] will be sent a lot sales report with delivery destination immediately after the Load is shipped out.  Final settlement will be made on sales in 15-21 days after shipment.  We need accurate accounting of sales with the guideline being USDA prices as a base.  All sales will be fob, not open.  [Sun Valley] will forward all documents to [Western Veg] upon receipt from Grower, Packer, Shipper, Port of Entry, Inspection, etc.  Per our agreement, 10% is more than a fair profit for structured Funding Agreement.

PACA Decision at 15; see also DUMF 60.

On January 11, 2018, Lym sent an e-mail to Bartel that read:  "We are wiring the advance on load #4 today.  I remember the agreement being that we would make final payments on loads at 30 days; not 15-21."  DUMF 61.

On January 22, 2018, Bartel sent an e-mail to Lym that read:

> Good Afternoon!  Received your e-mail from Saturday.  The operating cost that we gave you is less than 50% of our cost so your estimated projections are well below our costs.  The fruit that we are receiving at the Texas Cold Storage is quality fruit, passes USDA inspection and has also been passing the pressure test.  We follow PACA, USDA Market and Market Enforcement Regulations.  The fruit is FOB Texas and not on an open market with protection.  Your report of sales is not acceptable.  Your projected estimates are $10.00 - $15.00 below USDA Market Report prices.  [Sun Valley] pays [Western Veg] 10% for funding and quality sales

8

1  of its product, which we have to report to our Affiliates, Associates, and Board
   Members.

2  PACA Decision at 16; Rumph Dec. Ex. 1; see also DUMF 62.

3      On January 25, 2018, Erwin sent Ollivier and Lym an e-mail that read: "Due on Load #1 -

4  $29,048.00.   Due on Load #2 - $25,798.06.   Please wire funds today."   Rumph Dec. Ex. 3.

5      On January 26, 2018, Ollivier replied to Bartel's January 25 e-mail and stated: "We are

6  not in a position to wire any more money until we get pricing back from the last loads that were

7  sent out – I am hoping Monday we have pricing.  I have sent you 130k and I have not received

8  payment on any of the loads yet – should be coming shortly.  We will review on Monday and see

9  what we can do."  Id.; DUMF 63.  Bartel sent a reply e-mail to Ollivier the same day and stated:

10         The terms of agreement we have with [Western Veg] is that once you received the
           product at the Texas Cold Storage and it cleared proper inspection, you would
11         advance 50% of sales FOB Texas.  The final payment on each load would be made
           in 30 days from shipment per PACA Regulations.  That means that we should
12         receive final payment on Load #1 and Load #2, as they are both beyond 30 days.
           All loads past inspection and pressure prior to shipment out of the Texas Cold
13         Storage.  Attached are invoices based  upon the USDA Market, Dallas, Texas,
           dated according to inspection dates.
14

15  PACA Decision at 15; Doc. No. 29-5 at p.36.

16     On January 31, 2018, Bartel sent an e-mail to Ollivier and Lym in which he stated:

17         We don't understand about problems as we have not been given any evidence of
           problems, just been told there are problems.  All the fruit made good arrival at the
18         Texas Cold Storage and made USDS Inspection.  A lot of it was also pressure
           tested at the Texas Cold Storage and passed.  These avocados were all sold FOB,
19         Texas Cold Storage, not on an open market.  We have no idea where the fruit went
           or how it arrived.  Each load represents it's own lot and is not part of a pool.  We
20         are now told no further payments will be made until all the product  numbers are
           available.  We were also to be given weekly sales projection and were never given
21         any.  There has been no communication.  This is not acceptable and we will pursue
           alternative action to resolve this matter.
22

23  Doc. No. 29-5; see also DUMF 64.  Ollivier has declared that he responded to Bartel by stating

24  that $130,000 had already been advanced, that the avocados had "hot cores" which accelerated the

25  maturation process, and that as soon as the returns were obtained the remaining balance would be

26  paid to Sun Valley.  See Ollivier Dec. at ¶ 53.

27     After filing an informal Complaint in February 2018, Sun Valley filed a formal PACA

28  Complaint with the USDA against Western Veg for money that Sun Valley believed was owed to

9

it by Western Veg in connection with the sale of the six loads of avocados.  See Doc. No. 29-4.  In the parties' PACA proceedings, Sun Valley alleged that an oral contract existed for the sale of six truckloads of avocados for an agreed USDA Market Price of $447,130.  See id.  Sun Valley alleged that Western Veg owed a remaining balance of $218,659.98.  See id.  Sun Valley submitted the declaration of Andrew Sanders and Bartel as part of the PACA proceedings.  See Doc. Nos. 29-6, 29-7.  Andrew Sanders and Bartel declared that the terms of the verbal agreement between Sun Valley and Western Veg were:  (1) avocados would be shipped FOB Texas, where ownership of the avocados would be taken by Western Veg; (2) Western Veg would receive a 10% discount on the USDA price at the time upon acceptance of the avocados; and (3) Western Veg would pay 35% up front for each load, with the remainder to be paid within 30 days.  See Doc. No. 29-6 at ¶ 2; Doc. No. 29-7 at ¶ 1.  Andrew Sanders also declared that he learned after the PACA complaint was filed that Western Veg was claiming that because the avocados involved were "Don Avocados" that this somehow caused an issue, even though all six loads passed inspection by the USDA and were accepted by Western Veg after passing inspection.  See id. at ¶ 3.  Bartel also declared in relevant part:  (1) Western Veg initially paid 35% commission based upon the USDA price; (2) he was in constant e-mail contact with Western Veg concerning the six loads of avocados; (3) some of the e-mails indicate that the terms were FOB Texas; and (4) he never received e-mails from Western Veg indicating that the terms were not FOB Texas after he sent e-mails indicating that the terms were FOB Texas.  See Doc. No. 29-7 at ¶ 2.

For its part, Western Veg filed an answer in the PACA proceeding and stated in part that it agreed to market and sell Sun Valley's avocados on a consignment basis, without guaranteed prices, advancing certain sums to Sun Valley, and remitting net sales proceeds to Sun Valley after deducting for advance repayment, materials, cooling, and a 10% commission.  See Doc. No. 6 at ECF pp. 36-37.  Western Veg answered that it did not agree to any minimum prices or to USDA market prices and that it in fact would never agree to USDA market prices for consignment sales because those prices are inflated with charges such as freight, brokerage fees/commission, handling charges, and other costs.  See id. at p. 37.

Western Veg also submitted the declarations of Ollivier and Lym.  Ollivier declared that

the terms of the agreement were that Western Veg would accept six loads of avocados on a consignment bases, advance up to 50% of the estimated sales price, deduct its marketing costs, and take a 10% commission.  See Ollivier Dec. at ¶ 4.  In response to Sun Valley's rhetorical question of, why would Western Veg advance sums for a consignment sale, Ollivier explained that, since the final prices for a consignment sale are unknown, marketers typically advance a portion of the expected sales proceeds to a grower or importer in order to cover harvesting and shipping costs.  See id. at ¶ 6.  After the final sales are complete, the marketer provides an account of sale and remits sales proceeds, if any, to the grower or importer.  See id.  Ollivier contended that if the transactions were truly FOB Texas, then Western Veg would have issued purchase orders, received and accepted the produce, and Sun Valley would have invoiced Western Veg for the FOB Texas price at the time of the alleged acceptance in Texas, but that did not happen.  See id.  Instead, Ollivier declared that Western Veg inspected the avocados and agreed to market them, upon inspection Western Veg estimated the projected sales and advanced up to 50% to Sun Valley.  See id.  Ollivier declared that Sun Valley did not invoice Western Veg at the time of the alleged acceptance in Texas.  See id.  Ollivier declared that Sun Valley recognized that it needed Western Veg's final sales returns, frequently requested the sales return information, and agreed that Western Veg was entitled to a 10% commission.  See id.  Ollivier declared that although Western Veg characterized the commission in various e-mails as a commission, percentage discount, or profit margin, it remains a commission that a marketing agent or commission merchant typically receives for marketing produce.  See id.  Ollivier declared that Sun Valley's words/position are contradicted by its actions and industry norms and that if the agreement were truly FOB Texas, Sun Valley would have simply invoiced Western Veg for an agreed fixed price and would not have constantly sought sales returns information, accepted advances, allowed for deductions and commissions, waited for liquidation reports, and/or waited for sales proceeds remittance.  See id. at ¶ 7.

On October 22, 2020, the USDA issued its findings and decision, in which it found that the agreement between Western Veg and Sun Valley was a consignment agreement and that Western Veg had remitted all sums owed to Sun Valley.  See PACA Decision.  In part, the USDA decision

found:

> As [Western Veg's] David Ollivier asserts in his affidavit testimony, [Sun Valley's] words are contradicted by its actions. [Sun Valley] repeatedly asserts that [Western Veg] agreed to purchase the avocados FOB Texas at the prevailing prices reported by USDA Market News less a 10% "discount"; however, [Sun Valley] submitted evidence showing that [Bartel] sent multiple email messages to [Western Veg] requesting lot reports and settlement for the avocados. Mr. Bartel also acknowledges in an email message dated January 10, [2018] that the advances paid by [Western Veg] were 50% of the projected sales proceeds, which begs the question as to why [Sun Valley] would accept advances based on projected sales proceeds if the amount [Western Veg] agreed to pay for the avocados was predetermined based on prevailing USDA Market News prices. The obvious answer to the question is that the terms of the agreement were as [Western Veg] asserts, i.e. [Western Veg] would advance 50% of the projected sales proceeds, and upon completion of its resales, [Western Veg] would remit the gross resale proceeds, less advance prepayment, cooling and materials expenses and a 10% commission.
>
> . . . . As the evidence . . . establishes that the avocados were consigned to [Western Veg], [Western Veg's] liability to [Sun Valley] should be based on the gross proceeds collected from its sales of the avocados, less advance repayment, cooling and material expenses, and the 10% commission agreed upon between the parties.
>
> [Western Veg] submitted a detailed account of sales for each of the six shipments of avocados in question, as well as copies of its invoices for the sale of the avocados to its customers, and detailed liquidations showing the advances, expenses, and commissions that were deducted from the gross sales. Those documents show the avocados were sold for gross proceeds totaling $228,468.02. [Sun Valley] submitted an accounting crediting [Western Veg] with advances, payments, costs, and commissions totaling $228,470.02. As [Western Veg] has therefore remitted the full amount owed to [Sun Valley] according to the parties' agreement, we find that [Sun Valley's] Complaint should be dismissed.

PACA Decision at pp. 22-23.

As part of the briefing in this case, Sun Valley has submitted a declaration by Jared Sanders. In relevant part, Jared Sanders declares that, in 2016 or early 2017, he and Bartel negotiated the agreement between Sun Valley and Western Veg for the subject avocado sales. See J. Sanders Dec. ¶ 2. Jared Sanders explained that they agreed to terms for the sale of avocados to Western Veg with the following terms: (1) FOB Texas, (2) price would be the USDA price for the products (Dallas), and (3) Sun Valley would give Western Veg a 10% discount on the price and full payment would be made within 30 days. See id. Jared Sanders declared that the terms were agreed to by Jared Sanders and Bartel on behalf of Sun Valley and Ollivier on behalf of Western Veg. See id. Andrew Sanders also testified that the avocados were sold by Sun Valley to Western

1  Veg "FOB Texas," but with Western Veg receiving a 10% discount on the FOB price.  See A.

2  Sanders Depo. 33:2-13.  Jared Sanders declared that the term "FOB Texas" meant that the cold

3  storage facility in Texas is where Western Veg would take title and possession of the avocados.

4  See id.  Jared Sanders also declared that in the industry, FOB means "free on board" and that

5  whatever location is listed after the FOB is the place the buying party obtains title and possession

6  of the articles being sold.  See id.  With respect to the e-mails in which Bartel was requesting lot

7  information from Western Veg, Jared Sanders explains that "[t]his information was requested

8  because Western Veg was refusing to pay the sales price pursuant to the agreement (full payment

9  within 30 days).  Western Veg used as an excuse for such non-payment that its sales were not

10 sufficient to cover the expense of the sales price.  There was a feeling among myself and

11 management at the time (December 2017 and January 2018) that this was an excuse, hence

12 information to support his claim was requested."  Id. at ¶ 3.  Finally, Jared Sanders explains that

13 the agreement provided a "10% discount" to Western Veg, but people who worked for Sun Valley,

14 including Bartel, often referred to the discount by various names, including "commission" and

15 "profit." Id. at ¶ 4.

16      Sun Valley has presented no new declarations, depositions, or e-mails from Bartel.

17 Regrettably, Bartel died in early 2022.  See A. Sanders MSJ Dec. ¶ 5.

18

19                          **DEFENDANT'S MOTION**

20      *Defendant's Arguments*[10]

21      Western Veg argues that the PACA Decision should be upheld and that the Decision's

22 findings are determinative.  It is Sun Valley's burden to sufficiently rebut the findings and

23 determinations of the PACA Decision.  Any reliance on the declarations of Andrew Sanders and

24 Bartel that were submitted during the PACA proceedings is improper because the declarations

25 were not sworn, contrary to USDA rules.  Further, Sun Valley cannot produce sufficient rebuttal

26

27 ───────────────

[10] Western Veg argued in part that Sun Valley was a suspended LLC, which means that it cannot defend this action.
However, Sun Valley paid the appropriate fees to the California Secretary of State and is now in good standing.  As
such, there are no longer any relevant issues regarding Sun Valley's status as an LLC.  See Cadle Co. v. World Wide

28 Hospitality Furniture, Inc., 144 Cal.App.4th 504, 512 (2006); Gar-Lo, Inc. v. Prudential S&L Assn., 41 Cal.App.3d
242, 244 (1974); Doc. No. 31.

evidence because Bartel is deceased and he was the only person at Sun Valley who had firsthand knowledge of the transactions with Western Veg.  Further, the PACA decision reflects the USDA's knowledge and expertise of PACA and the problems and practices within the produce industry.  Finally, Western Veg requests attorneys fees under 7 U.S.C. § 499g(c).

In reply, Western Veg argues in part that its prior four year course of dealing with Jared Sanders all involved consignments, and Jared Sanders was a member or manager of Sun Valley.  This course of dealing indicates that the agreement in this case was a consignment.

Western Veg also replies that it did not agree or admit that the agreement was FOB Texas.  Western Veg contends  that it objected within two hours of receiving the first alleged FOB Texas invoice by saying that the sales returns were no where close to the $89,000 invoice and that the sales report would be forwarded that day.  Bartel replied by expressing concern over market conditions.  The detailed account of the sale was provided to Sun Valley that day.  Further, Western Veg contends that there is no evidence that Sun Valley sent invoices 2 through 6 around the dates of those invoices, notes that invoice 6 is dated January 11 even though Load #6 was not sent until January 15, and avers that invoices 2 through 6 were not received until February 2018.

*Plaintiff's Opposition*

Sun Valley argues that the key issue is whether the agreement in this case was a consignment agreement or one in which the avocados were sold to Western Veg FOB Texas.  If the latter, the risk of any loss from a failure to sell falls on Western Veg because title changed hands to Western when it took possession of the avocados in Texas.  Whether a transaction is a sale or consignment is determined by examining the intent of the parties, and matters of intent are typically factual matters that are unsuited to summary judgment.

Sun Valley argues that Bartel's declaration in the PACA proceedings, as well as e-mails he sent to Ollivier or Lym, contain references to the agreement being "FOB Texas."  Western Veg did not contradict the assertion that the agreement was FOB Texas, which is an admission by silence that the terms of the agreement were FOB Texas.  Further, Jared Sanders also participated in the negotiations of the terms of the agreement with Western Veg, and he has confirmed that the terms of the agreement were FOB Texas using the USDA prices for avocados.

14

1    Sun Valley also argues that its invoices and Western Veg's documents indicate a sale of

2    avocados and not a consignment.  USDA prices are reflected in the six invoices sent to Western

3    Veg by Sun Valley for the six loads of avocados.  Sun Valley contends that the fact that it

4    submitted invoices indicates a sale because if the agreement were really a consignment, Sun

5    Valley states that it would have simply waited for the sales reports and obtained its percentage.

6    Further, Western Veg admits that it was paying 50% after receipt of each loads, with the

7    remainder due in 30 days.  This indicates a sale because 50% can be easily calculated based on the

8    agreed upon price.  If a consignment were involved, then it unknown how to appropriately glean

9    50% because the sale had not yet occurred.

10    Finally, Sun Valley argues that Bartel's e-mails in which he requested lot reports does not

11    show that the transaction was a consignment.  Sun Valley avers that Western Veg indicated that it

12    was not making timely payments due to slow sales.  That is, Western Veg was holding funds owed

13    based on alleged poor sales.  It is natural to want to see the lot reports to see if it would be paid the

14    sales price agreed or to see if litigation would be necessary.  This is what Bartel's January 31,

15    2018 e-mail states in which litigation was threatened.  If a consignment agreement were really

16    involved, then Sun Valley states that it would have to wait for sales reports and an accounting

17    before it would be entitled to payment or be able to threaten litigation.  Further, when Ollivier

18    responded to Bartel's e-mail that Western Veg has 30 days to pay the balance as discussed earlier,

19    Ollivier implicitly agrees that there was a sale.  If the agreement was a consignment, Ollivier

20    would not know if a balance would be required because the avocadoes may not even be sold,

21    which would leave no balance due and owing.  However, with a sale of avocados FOB Texas,

22    there would always be a balance due and owing for each load.

23    _Legal Standards_

24    In California, a consignment transaction "is one in which the merchant takes possession of

25    goods and holds them for sale with the obligation to pay the owner for the goods from the

26    proceeds of a sale by the merchant."  <u>Fariba v. Dealer Servs. Corp.</u>, 178 Cal.App.4th 156, 164-65

27    (2009); <u>Bank of Cal. v. Thorton-Blue Pacific, Inc.</u>, 53 Cal.App.4th 841, 847 (1997).  In a

28    consignment sale agreement, "title to the goods generally remains with the original owner."

<u>Fariba</u>, 178 Cal.App.4th at 165; <u>Bank of Cal.</u>, 53 Cal.App.4th at 847.  That is, a consignment of goods for sale is a form bailment that does not effect a sale or the passage of title between the consignor and the consignee.  <u>See</u> <u>Martini E Ricci Iamino S.P.A. – Consortile Societa Agricola v. Trinity Fruit Sales Co.</u>, 30 F.Supp.3d 954, 966 (E.D. Cal. 2014).

In California, "FOB" means "free on board," which is a term associated with the sales of goods.  <u>See</u> Cal. U.C.C. §§ 2101, 2102, 2105, 2106(1), 2108, & 2319(1).  When an agreement contains an FOB destination term, this is a delivery term in which the "seller must at his own expense and risk transport the goods to that [destination] and there tender delivery of [the goods]." Cal. U.C.C. § 2319(1)(b).  In the absence of contrary language in the agreement, a contract for FOB destination means "title [to the goods] does not pass until the goods have arrived at [the agreed] destination."  <u>Standard Oil Co. v. Johnson</u>, 24 Cal.2d 40, 46 (1944); <u>see</u> <u>Santa Clara Sand & Gravel Co. v. State Bd. of Equalization</u>, 225 Cal.App.2d 676, 681-82 (1964); <u>Lewis v. Farmer's Grain & Milling Co.</u>, 52 Cal.App. 211, 213-14 (1921).

The intent of the parties determines whether a transaction is a bailment/consignment or a sale.  <u>See</u> <u>Consolidated Accessories Corp. v. Franchise Tax Bd.</u>, 161 Cal.App.3d 1036, 1040 (1984); <u>Northern Counties Bank v. Earl Himovitz & Sons Livestock Co.</u>, 216 Cal.App.2d 849, 859 (1963).  The entire contract and the parties actions must be considered in determining whether an agreement was for a sale or a consignment.  <u>Consolidated Accessories</u>, 161 Cal.App.3d at 1040.  Factors that may be considered are:  (1) suggestion and contemplation of consignment in the memorandum of the agreement between the parties; (2) lack of obligation on the part of the "consignee" to pay for unsold goods; (3) obligation of the consignee to pay for goods when sold by him; (4) prompt remittance to consignor for goods sold, whether for cash or credit; (5) visits to consignee to inquire into sales and urge prompt remittance of collections to consignor; (6) keeping by a representative of the consignor of an account or inventory of goods consigned and sold; and (7) provision for return of merchandise upon termination of the agreement.  <u>Id.</u> at 1040-41.

### *Discussion*

The parties appear to agree that the key issue in this case is the nature of the agreement for the avocados.  Western Veg contends that the agreement was a consignment as found in the PACA

1 decision, while Sun Valley contends the agreement was for a sale FOB Texas.  To rebut the PACA

2 decision, Sun Valley relies on the PACA proceeding declarations of Bartel and Andrew Sanders

3 and the deposition testimony of Jared Sanders which all indicate that the terms of the agreement

4 included the sale of avocados to Western Veg "FOB Texas," with a percentage due on receipt, and

5 a 10% discount paid to Western Veg.  Additionally, there are four e-mails from Bartel that

6 reference some form of an FOB sale:  on January 10, 2022, Bartel stated in part that "All sales will

7 be fob, not open"; on January 22, 2022, Bartel stated in part that the "fruit is FOB Texas and not

8 on an open market with protection"; on January 26, 2022, Bartel stated in part that Western Veg

9 "would advance 50% of sales FOB Texas"; and on January 31, 2022, Bartel stated, "These

10 avocados were all sold FOB, Texas Cold Storage, not on an open market."

11       With respect to the PACA declarations of Andrew Sanders and Bartel, Western Veg

12 contends that these declarations do not comply with USDA regulations and should be disregarded.

13 However, whether the declarations comply with USDA regulations is irrelevant in this proceeding.

14 The proceeding in this Court is a trial *de novo*, see 7 U.S.C. § 499g(c); <u>Tray-Wrap, Inc. v. Six L's</u>

15 <u>Packing Co.</u>, 984 F.2d 65, 66 (2d Cir. 1993), which "is not a genuine 'review' action" of the

16 PACA Decision.  <u>Exportal Ltda. V. U.S.</u>, 902 F.2d 45, 49 (D.C. Cir. 1990).  The Court may

17 consider both evidence that was submitted and not submitted during the PACA proceeding in

18 order to determine whether Sun Valley has adequately rebutted the PACA Decision findings.  <u>See</u>

19 <u>Sun Pac.</u>, 2010 U.S. Dist. LEXIS 83176 at *25-*26; <u>see also</u> <u>Georgia Vegetable Co. v. Relan</u>, 731

20 F.2d 798, 802 (11th Cir. 1984) ("In a trial *de novo* evidence in addition to that introduced before

21 the Secretary *may*, of course, be offered and considered in the *de novo* trial." (emphasis added)).

22 Moreover, as Sun Valley correctly points out, the declarations meet the requirements of 28 U.S.C.

23 § 1746 as they are attested under penalty of perjury.  Therefore, the Court will consider the

24 declarations in deciding Western Veg's motion for summary judgment.  <u>See</u> 28 U.S.C. § 1746(2);

25 <u>LNS Enters. LLC v. Continental Motors, Inc.</u>, 22 F.4t h 852, 858 (9th Cir. 2022); <u>Shepard v.</u>

26 <u>Quillen</u>, 840 F.3d 686, 687 n.1 (9th Cir. 2016).

27       Nevertheless, while the Court will consider the PACA declarations of Bartel and Andrew

28 Sanders, and those declarations do support the position that the sale was FOB Texas, there is a

concern.  These declarations use identical language to describe the agreement and both declarations state that Western Veg was to forward 35% of the sales price with the remainder to be paid within 30 days.  However, no e-mail or any other evidence indicate or support the assertion that 35% was to be paid immediately to Sun Valley.  The 35% figure is contrary to both the terms found by the PACA Decision and the e-mails that Bartel sent to Western Veg.  Further, Sun Valley in its briefing before this Court does not argue that a 35% advance payment was part of the terms of the agreement or address Western Veg's assertion that Bartel's and Andrew Sanders's PACA declarations are inconsistent with other evidence and other positions taken by Sun Valley.  Instead, Sun Valley's briefing seems to accept that a 50% advance was the agreement, which is consistent with Bartel's e-mails and the PACA Decision.  Given these considerations, the assertion that a 35% advance was part of the parties' agreement undermines the credibility of the Bartel's and Andrew Sanders's PACA declarations

        With respect to Bartel's e-mails, Sun Valley argues that because Western Veg never challenged Bartel's assertions that the agreement was FOB Texas, Western Veg's silence is an adoptive admission that the terms of the agreement were FOB Texas.  "Before admitting a proffered admission by silence under Fed. R. Evid. 801(d)(2)(B), the district court must first find that sufficient foundational facts have been introduced for the jury reasonably to conclude that the defendant did actually hear, understand, and accede to the statement.  Once admitted, the jury decides whether the defendant actually heard, understood, and acquiesced in the statement."  United States v. Monks, 774 F.2d 945, 950 (9th Cir. 1985).  An admission by silence can apply with respect to oral and written statements.  Boerner v. United States, 117 F.2d 387, 390-91 (2d Cir. 1941); 5 Weinstein's Fed. Evid. § 801.31[d].  Particularly when parties are engaged in a business relationship and have engaged in mutual correspondences, the failure to reply to a writing that contains statements for which it would be natural under the circumstances for the recipient/addressee to deny if he believed the statements to be untrue may constitute an admission by silence.  Megarry Bros., Inc. v. United States, 404 F.2d 479, 488 (8th Cir. 1968); see also 5 Weinstein's Fed. Evid. § 801.31[d].

        The Court agrees that the various references to FOB or FOB Texas in Bartel's e-mails

could be viewed by the jury as admissions by silence. Western Veg and Sun Valley were clearly engaged in a business relationship regarding the avocados and regularly communicated through e-mail. Cf. Megarry Bros., 404 F.2d at 488. At least once before three of the avocado loads were received, and then three times after all loads were received, Bartel stated that the terms were either FOB or FOB Texas and not an open market. In response to Bartel's January 10, 2018 e-mail and an assertion as to when full payment was due, Lym corrected Bartel on January 11 that final payment was due after 30 days, not 15 to 21 days. See DUMF 61. However, there are no e-mails in which Western Veg personnel clearly stated that the agreement was a consignment and that FOB or FOB Texas was not part of the agreement. Considering the parties' apparent agreement as to the effect of an FOB Texas term, i.e. transforming the agreement into a sale of avocados to Western Veg as opposed to a consignment agreement, and considering that Lym did resist at least one other inaccurate term, it could reasonably be expected that Western Veg would object to any of Bartel's references to FOB or FOB Texas. See Megarry Bros., 404 F.2d at 488; 5 Weinstein's Fed. Evid. § 801.31[d]. While it is true that Ollivier stated in the December 21, 2017 e-mail exchange that the invoice did not come close to the sales price obtained by Western Veg, the e-mail did not actually address the term FOB. Viewing Ollivier's e-mail in the light most favorable to Sun Valley as the non-moving party, the e-mail can reasonably be viewed as complaining about the amount of the invoice as opposed to a particular term of the agreement. Therefore, the failure to deny the FOB or FOB Texas terms (or any other terms identified by Bartel) in Bartel's e-mails could be viewed as an adoptive admission by a jury. See Fed. R. Evid. 801(d)(2)(B); Monks, 774 F.2d at 950; Megarry Bros., 404 F.2d at 488; 5 Weinstein's Fed. Evid. § 801.31[d].

In terms of the seven *Consolidated Accessories* factors, some factors support the existence of a sales transaction, while other support the existence of a consignment agreement. First, there was no formal memorandum regarding the agreement between the parties. Although a CA was sent to Bartel in January 2017, the PACA Decision found that the CA was inapplicable because it involved a different growing season than the avocados at issue. See PACA Decision at 22. Western Veg has not demonstrated that this finding was erroneous. Second, there is no indication that the parties made arrangements or set conditions for a return of any unsold avocados at the

1  termination of the agreement, nor has there been evidence regarding obligations for any "unsold"

2  avocados.  In fact, that final payment of all outstanding funds was due 30 days after receipt

3  indicates that there was no contemplation for "unsold" avocados at all, which can be viewed as

4  indicative of a sale.  Third, there is no evidence that Sun Valley kept a ledger of avocados

5  consigned and avocados sold.  Rather, the only evidence of Sun Valley's records indicates

6  invoices for the sales of avocados to Western Veg.  Fourth, in terms of payment, the parties'

7  conduct shows that funds were advanced/sent by Western Veg to Sun Valley upon Western Veg's

8  shipment of the avocados to Texas.  Western Veg then had 30 days in which to remit all remaining

9  funds, less certain expenses and less 10% for a "commission" or "discount" (depending on which

10 party is describing the nature of the 10%).  This payment structure does not necessarily seem

11 consistent with a "prompt remittance" for goods sold, and it does not create an obligation to pay

12 only when or if the avocados were sold.  Rather, it seems to create an obligation by Western Veg

13 to pay.  Finally, while there is no evidence that Sun Valley made trips to any Western Veg facility

14 (either in California or Texas), Sun Valley nevertheless made a number of inquiries regarding

15 sales/lot reports and urged prompt remittance of money from Western Veg for the avocados.  As

16 found in the PACA Decision, this particular aspect of Sun Valley's conduct can certainly be

17 viewed as indicative of a consignment.  Although Sun Valley argues that Bartel was requesting lot

18 reports because Western Veg was delaying full payment within 30 days due to alleged poor sales,

19 see Jared Sanders Dec. ¶ 3, that does not follow the e-mail timeline.  Bartel asked for lot reports

20 on December 21, 2017, December 26, 27, and 28, 2017, January 8, 2018, and January 10, 2018.

21 For each of these dates, the only funds due would be 50% since none of these dates are 30 days or

22 more from shipment (or receipt) of any avocado load.  Not until January 19 or 20, 2018, would

23 full payment on Load #1 become due.  Therefore, the request for lot reports and payment can be

24 viewed as consistent with a consignment, rather than a sale.

25      Additionally, as part of the parties' conduct, at least three e-mail exchanges are significant.

26 First, on January 10, 2018, Bartel sent an e-mail that followed up on conversations between

27 Western Veg personnel (Ollivier, Lym, and Huston) and Sun Valley personnel (Bartel and Jared

28 Sanders).  See PACA Decision at 15.  As quoted above, Bartel indicates that Sun Valley needs

1  "projected sales prices each week on avocados," Western Veg was to advance 50% of the

2  projected sales, Sun Valley was to be sent a lot sales report with delivery destination immediately

3  after a load shipped, and that final settlement would be made 15 to 21 days after shipment.  See id.

4  Bartel stated that Sun Valley needed accurate accounting of sales "with the guideline being USDA

5  price as a base.  All sales will be fob, not open."  Id.  The e-mail concluded by stating, "Per our

6  agreement, 10% is more than a fair profit for a structured Funding Agreement."  Id.

7         As emphasized by the PACA Decision, requests regarding projected sales are consistent

8  with a consignment.  However, the January 10 e-mail mentions that the sales are "fob, not open

9  market" which could refer to future sales made by Western Veg to third parties, or could refer to a

10  sale by Sun Valley to Western Veg.  Further, the January 10 e-mail states that the guideline for

11  sales would be the "USDA price as a base."  This suggests any sales price would be expected to be

12  near a published USDA price.  However, the PACA decision made no findings regarding any form

13  of USDA pricing or the significance of the e-mail's reference to USDA pricing.  Reference to the

14  USDA pricing as the base or guideline is consistent with a consignment because the consignor has

15  the authority to set pricing.  See Martini E Ricci, 30 F.Supp.3d at 966.  However, reference to

16  USDA pricing as a base or guideline could also be consistent with a form of sale to Western Veg

17  in that a "floating price" could be contemplated.  That is, Western Veg would take title to the

18  avocados and advance 50% of a projected USDA guided price, but then have additional time to

19  sell the avocados at, above, or slightly below the USDA guideline price, with Western Veg's re-

20  sale price (i.e. the price Western Veg sold the avocados to a third party) becoming the actual sales

21  price from Sun Valley to Western Veg.

22         Second, on January 22, 2018, Bartel sent Lym an e-mail that in part described the

23  transaction.  Bartel stated that the avocados were "FOB Texas and not an open market with

24  protection."  PACA Decision at 16.  Bartel then explained that the report of sales were not

25  acceptable and that the "projected estimates are $10.00 - $15.00 below USDA Market Report

26  prices.  [Sun Valley] pays [Western Veg] 10% for funding and quality sales of its products . . . ."

27  Id.  This e-mail clarifies that the sales are FOB Texas, not open market, and is consistent with the

28  January 11 e-mail.  With the addition of "Texas" after "FOB," as well as the rejection of an "open

market" sale, this language is consistent with a sale to Western Veg.  The e-mail also emphasizes the importance of USDA prices and a complaint that Western Veg's projected sales were significantly below those listed prices.  Finally, the e-mail clarifies that Sun Valley pays Western Veg 10% for two services:  funding (which the Court takes to mean funding for transport and growing expenses, see Ollivier Dec. at ¶ 6) and "quality sales."  Paying another person to sell goods clearly supports a consignment transaction.  However, it may also support a "floating price" as discussed above, because the greater Western Veg's re-sales are, the greater the 10% discount/profit will be.

Third, Bartel's January 26, 2018 e-mail to Ollivier explained that, once the avocados arrived in Texas and cleared inspection, Western Veg was to advance "50% of sales FOB Texas" with "final payment on each load [due] 30 days from shipment[.]"  See PACA Decision at 16.  The e-mail then stated that it attached invoices "based upon the USDA Market, Dallas, Texas, dated according to inspection dates."  Id.  Asserting that there were sales "FOB Texas," and then attaching invoices based on USDA market rates for Dallas, Texas are consistent with some form of sale to Western Veg based on USDA rates.

Finally, apart from the e-mails, but in relation to the parties' conduct, Sun Valley does not contend that Western Veg failed to pay the first 50% in a timely fashion.  However, none of the money advanced by Western Veg was consistent with what amounts to 50% of the invoices prepared by Sun Valley.  All amounts forwarded by Western Veg were significantly below 50% of Western Veg's invoices, and thus, well below what Sun Valley believed the relevant USDA market price to be (assuming that Western Veg's invoices reflected USDA market prices).  Based on the e-mails submitted, Sun Valley only complained about the amount of the advanced price with respect to Load #1.  Not until half of the loads had been shipped did Sun Valley hold talks with Western Veg, which resulted in the January 10, 2018 e-mail.  It was only on January 26, 2018, after all loads had been shipped and delivered, that Sun Valley formally complained in writing about prices used or obtained by Western Veg.  Conversely, when Bartel sent Ollivier an invoice for the first load of avocados on December 21, 2017, Ollivier did not complain about receiving the invoice per se.  Instead, Ollivier responded that the re-sale price was significantly

1  less than the invoiced price.  Further, there are no e-mails in response to Bartel's January 26 e-

2  mail and the purported invoices that were attached.  Receiving invoices for a particular amount

3  due is more consistent with a sale than a consignment.

4        Under the PACA review framework, this proceeding is a trial *de novo*, it is not a review to

5  ensure that the PACA Decision is support by substantial evidence (for example).   The findings in

6  the PACA Decision are *prima facie* valid and are enough by themselves to meet Western Veg's

7  initial burden on summary judgment.  Nevertheless, during summary judgment, the Court is

8  required to credit Sun Valley's evidence and make all reasonable inferences in Sun Valley's favor.

9  Narayan, 616 F.3d at 899.  So viewing the evidence and the PACA Decision's findings, the Court

10  concludes that a reasonable jury could reject the finding of the Secretary that the agreement was a

11  straight consignment agreement and that no other money is due to Sun Valley.

12        As the Court has endeavored to describe above, the *Consolidated Associates* factors are a

13  mixed bag, some of the factors support a sale and some support a consignment.  Similarly, the e-

14  mail exchanges have aspects to them that are supportive of a sale to Western Veg, but also have

15  aspects that are supportive of a consignment to Western Veg.  Importantly, as Sun Valley points

16  out, there are no e-mails or any other evidence that clearly or definitively disavow key descriptions

17  of the agreement by Bartel, particularly the "FOB" or "FOB Texas" terms.  In fact, the only term

18  that any Western Veg representative clearly questioned was the timeframe for final payment (30

19  days instead of 15 to 21).  Under *Megarry Bros.*, a jury could find that Western Veg's silence was

20  an admission that the terms were as described in Bartel's e-mails.  Thus, while the evidence and

21  conduct of the parties could support a finding that the transaction was a mere consignment, it

22  could also support a finding that some form of sale to Western Veg was involved.  In other words,

23  divergent inferences and conclusions are possible and a reasonable jury could reach a different

24  conclusion than the PACA Decision regarding the nature of the agreement between the parties.

25        Further, if the jury finds a transaction that is different from that found by the Secretary, the

26  decision that no other funds were owed to Sun Valley becomes infirm.  The PACA Decision did

27  not rely on or discuss USDA market prices, or the portions of Bartel's e-mails in which USDA

28  market prices are identified.  The e-mails indicate that the USDA market prices were to be at least

1  a base or guideline price, and there appears to be no dispute that the sale prices obtained by

2  Western Veg were materially less than any relevant USDA published price.  The USDA market

3  price would be relevant to addressing any prices that may have been agreed by the parties (either

4  in terms of a consignment or a sale), or in setting the amount of a what a reasonable sales price

5  would be if a jury determines that the parties agreed to a sale to Western Veg, but did not agree on

6  a sales price for the avocados.

7      In sum, the evidence is not so clear that the Court can hold that all of the relevant PACA

8  Decision's findings remain valid and established, nor is the evidence so clear that the only

9  reasonable inferences that can be drawn all support Western Veg.  Under such circumstances,

10  summary judgment must be denied.  See Fresno Motors, 771 F.3d at 1125.

11

12                                    **ORDER**

13      Accordingly, IT IS HEREBY ORDERED that Western Veg's motion for summary

14  judgment (Doc. No. 28) is DENIED.

15

16  IT IS SO ORDERED.

17  Dated:   October 27, 2022      _____

18                                    SENIOR  DISTRICT  JUDGE

19

20

21

22

23

24

25

26

27

28

24